CARWILE, RESPONDENT, *v.* JONES, APPELLANT.

(No. 2,662.)

(Submitted March 17, 1909. Decided April 12, 1909.)

[101 Pac. 153.]

*Elections—Ballots—Manner of Marking—Statutes—Mutilated Ballots—Qualified Voter—Residence—"Removal."*

Election Contest—Ballots—Manner of Marking—Statutes.
1. In an election contest the court properly refused to count for the Democratic candidate ballots marked as follows: (1) Where the cross was placed after the candidate's name and entirely without his party column; (2) where perpendicular lines were drawn through the names in the Republican column, but no cross was placed before his name; and (3) where his name was written in the Socialist column but no cross marked in the square before the name. In neither instance was there a substantial, or any, compliance with the provisions of section 552, Revised Codes, relative to how the elector shall prepare his ballot.

Same.
2. By placing a cross in the square before the blank space left below a candidate's name, and failing to write in such blank space the name of some person for whom he desired to vote, the elector did not vote for anyone.

Same.
3. The court properly refused to count a ballot for the Republican candidate which was marked by crossing out all the names in the other columns, but which failed to show an "X" before his name. While the intention of the voter is generally a very material consideration, he must express his intention substantially as indicated by the statute.

Same—Ballots—Indorsement by Election Judges—Surplusage.
4. A ballot bearing the indorsement: "Voted by H. and M. [judges of election] for illegibility of voter," was not void on the ground that the reason given for assisting the voter was not one recognized by law. Section 555, Revised Codes, does not require the judges to certify the reason for assisting an elector, and the words "for illegibility of voter" were therefore surplusage; and in the absence of a showing why they gave assistance, it will be presumed that they regularly performed their official duties.

Same—Ballots—Manner of Marking.
5. Where the cross-mark was placed *after* the candidate's name but within his party column, the ballot was void, since the elector did not substantially comply with the requirement of section 552, Revised Codes, that the "X" must be placed *before* the name.

Same—Ballots—What Constitutes an "X."
6. Any mark within the square before the candidate's name, which can be said to be a crossing of two lines, will answer the requirement of the statute that the elector must place an "X" in such square; and in the absence of anything to indicate a purpose on his part to identify his ballot by the use of a third line within the square, a defect in the mark is not sufficient to vitiate the ballot.

Same—Ballots—Manner of Marking.

    7.  The Socialist party had no candidate for the office over which the contest arose. A cross was placed before the name of every candidate in the Republican and Socialist columns, and the names in the other party columns had been crossed out. *Held,* that the ballot should not have been counted for the candidate in the Republican column. The ballot was one from which it was impossible to determine the elector's choice, and therefore void under section 575, Revised Codes.  (MR. JUSTICE SMITH dissents.)

Same—Ballots—Failure to Detach Stub—Effect.

    8.  The court erred in refusing to count a ballot, properly marked, but from which the stub had not been detached by the ballot judge as required by section 552, Revised Codes. A voter may not be disfranchised by the errors or wrongful acts of election officers.

Same—Mutilated Ballots—Presumptions.

    9.  In the absence of any showing that a ballot was mutilated by the elector, the presumption is that the mutilation occurred after the ballot left his hands.

Same—Ballots—Mutilation by Officers—Effect.

    10.  Where it was apparent from an inspection of a mutilated ballot, found in the ballot-box in two separate pieces and with one portion containing the names of two candidates in each party column missing, that it was torn by the ballot judge in detaching the stub, the court erred in refusing to count it.

Same—Qualified Voter—Residence—"Removal."

    11.  During the months of July, August and October, 1907, certain persons came to Montana from the state of Iowa. They then selected and filed on homesteads, with the intention to make this state their future home. Shortly thereafter they returned to Iowa, without having made any improvements on their homesteads, for the purpose of arranging their affairs preparatory to returning to this state. In the spring of 1908, each brought his family to Montana and settled on his respective homestead, residing there continuously thereafter. None of them voted in Iowa between the fall of 1907 and the spring of 1908. They voted at the general election held in November, 1908. *Held,* that the court committed error in ruling that they were not legal voters; *held,* further, that having formed the intention, when filing on their homestead, to make Montana their future home, this state became and was their place of residence in the sense of that term as used in the election laws, and that their coming to this state in the summer of 1907, coupled with the selection of their new homes, constituted their "removal" from their former home.

*Appeal from District Court, Yellowstone County; W. R. C. Stewart, Judge, presiding.*

ELECTION CONTEST by Nat. G. Carwile against Lorin T. Jones. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

*Mr. Harry L. Wilson,* and *Mr. Fred. H. Hathhorn,* for Appellant.

*Mr. W. M. Johnston,* for Respondent.

Respondent in an election contest may have errors appearing on the record reviewed, though he takes no appeal. (*Vorhees* v. *Arnold,* 108 Iowa, 77, 78 N. W. 797; *First Nat. Bank* v. *Wright,* 84 Iowa, 728, 48 N. W. 91, 50 N. W. 23.) "The mere personal presence of a person otherwise qualified in a voting precinct, for the period required by law, does not necessarily constitute such person an elector, unless he has moved in with the honest and settled intention of acquiring a new domicile." (*Jain* v. *Bossen,* 27 Colo. 423, 62 Pac. 194; see, also, *Sharp* v. *McIntire,* 23 Colo. 99, 46 Pac. 115; *Fry's Election Case,* 71 Pa. St. 302, 10 Am. Rep. 698; *Moffett* v. *Hill,* 131 Ill. 239, 22 N. E. 821; *Carter* v. *Putnam,* 141 Ill. 133, 30 N. E. 682; *Warren* v. *Thomaston,* 43 Me. 406, 69 Am. Dec. 70.) An intention to change one's domicile, without an actual removal with the intention of remaining, does not cause a loss of domicile so as to deprive a party of his right to vote. (*State* v. *Hallett,* 8 Ala. 159; *Shepard* v. *Allen* (Ill.), 17 N. E. 756; *William* v. *Whiting,* 11 Mass. 424. See, also, *Cary* v. *Tice,* 6 Cal. 626; *Barney* v. *Oelrichs,* 138 U. S. 529, 11 Sup. Ct. 414, 34 L. Ed. 1037; *Frost* v. *Brisbin,* 19 Wend. 11, 32 Am. Dec. 423; *Lawson* v. *Adlard,* 46 Minn. 243, 48 N. W. 1019; *State* v. *Allen,* 48 W. Va. 154, 86 Am. St. Rep. 29, 35 S. E. 990, 50 L. R. A. 284; *Shaeffer* v. *Gilbert,* 73 Md. 66, 20 Atl. 434; *Dorsey* v. *Brigham,* 177 Ill. 250, 69 Am. St. Rep. 228, 52 N. E. 303, 42 L. R. A. 809.)

It is mandatory to place the cross opposite the name of the candidate for whom the voter intends to vote. (*Lay* v. *Parsons,* 104 Cal. 661, 38 Pac. 447.) Making a cross wholly outside the proper square invalidates the ballot. (*Parker* v. *Orr,* 158 Ill. 609, 41 N. E. 1002, 30 L. R. A. 227; *Bechtel* v. *Albin,* 134 Ind. 193, 33 N. E. 967; *Sego* v. *Stoddard,* 136 Ind. 297, 36 N. E. 204, 22 L. R. A. 468; *Ogg* v. *Glover,* 72 Kan. 247, 83 Pac. 1039; *McCarthy* v. *Wilson,* 146 Cal. 323, 82 Pac. 243; *In re Hearst,* 48 Misc. Rep. 453, 96 N. Y. Supp. 119; *Rexroth* v. *Schein,* 206 Ill. 80, 69 N. E. 240.) Making a cross in the blank space between columns of two different tickets on the ballot invalidates

the ballot, even though it is made nearer to one name than another. (*Apple* v. *Barcroft,* 158 Ill. 649, 41 N. E. 1116; *State* v. *Sadler,* 25 Nev. 131, 83 Am. St. Rep. 573, 58 Pac. 292, 59 Pac. 546, 63 Pac. 128.)   Where the "X" is made in the square before the blank space under a candidate's name, such mark cannot be counted as a vote for the candidate whose name appears above such blank space.   This is even true where a small portion of the cross may be above the line.   (*People* v. *Town,* 106 Cal. 500, 39 Pac. 937; *In re Ballot Marks,* 18 R. I. 822, 27 Atl. 608; *Strosnider* v. *Turner* (Nev.), 93 Pac. 502; *Smith* v. *Reid,* 223 Ill. 493, 79 N. E. 148; *Flanders* v. *Roberts,* 182 Mass. 524, 65 N. E. 902; *O'Connell* v. *Mathews,* 177 Mass. 518, 59 N. E. 195; *In re Flynn's Contested Election,* 181 Pa. St. 457, 37 Atl. 523; *Hughes* v. *Upson,* 84 Minn. 85, 86 N. W. 782; *Morrison* v. *Pepperman,* 112 Iowa, 471, 84 N. W. 522; *State* v. *Peter,* 21 Wash. 243, 57 Pac. 814; *Voorhees* v. *Arnold,* 108 Iowa, 77, 78 N. W. 797.)   Where the "X" was made in the circle at the head of the Republican and Prohibition tickets, and there was no candidate for the office in question on the latter ticket, it was held that such ballot could not be counted as a vote for the Republican candidate for that office.   (*Mc-Mahon* v. *Polk,* 10 S. D. 296, 73 N. W. 79, 47 L. R. A. 830; *Hope* v. *Flentge,* 140 Mo. 390, 41 S. W. 1006, 47 L. R. A. 806.) Where a voter endeavors to express his intention by making any other mark than an "X," the ballot should not be counted. (*Ellis* v. *Glaser,* 102 Mich. 405, 61 N. W. 648; *In re Vote Marks,* 17 R. I. 812, 21 Atl. 962; *Brewster* v. *Sherman,* 195 Mass. 222, 80 N. E. 821; *Kelley* v. *State,* 79 Miss. 168, 30 South. 49; *Christopherson* v. *Common Council,* 117 Mich. 125, 75 N. W. 445.)   Mutilated ballots or ballots with part of the names of candidates torn off are void.   (*Phelan* v. *Walsh,* 62 Conn. 260, 25 Atl. 1; 17 L. R. A. 364.)   Pencil erasures of candidates' names, or pencil marks over candidates' names, may not be counted as a vote for the candidates whose names are not erased, neither may it be counted as a vote for any candidate.   (*Apple*

v. *Barcroft, supra; McKittrick* v. *Pardee,* 8 S. D. 39, 65 N. W. 23.)

The failure of a judge to tear off the stub containing the number of the ballot makes the ballot void. This no more subjects the elector to loss of his vote because of an act of the election officer than the failure of such officer to stamp the ballot. (*Berryman* v. *Megginson,* 229 Ill. 238, 82 N. E. 256; *Choisser* v. *York,* 211 Ill. 56, 71 N. E. 940; *People* v. *Board of County Canvassers etc.,* 129 N. Y. 395, 29 N. E. 327, 14 L. R. A. 624.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

At the general election held in November, 1908, Lorin T. Jones was the Republican candidate, and Nat. G. Carwile the Democratic candidate, for the office of clerk of the district court of Yellowstone county. The votes were counted, returned and canvassed, and from the canvass it appeared that Jones had received 1,584 votes, and Carwile 1,574 votes. A certificate of election was thereupon issued to Jones, and Carwile contested the election. Upon the trial of the contest the district court found that Carwile had received 1,577 votes, while Jones had received 1,575 votes. From the judgment declaring Carwile elected, and annulling the certificate issued to Jones, the defendant Jones has appealed. Under the provisions of the Act of the Tenth Legislative Assembly, approved February 25, 1907 (Laws 1907, p. 66), the exceptions of each party are presented for review.

1. *Plaintiff's Exhibits 4, 5, 9, 10, 12, and Defendant's Exhibit L.* The plaintiff predicates error upon the ruling of the trial court in refusing to count for him each of six ballots. In three of these (Exhibits 4, 5, and 9) the cross is placed after the name of Carwile, and entirely without the Democratic column. In Exhibit 10 perpendicular lines are drawn through the names in the Republican column, but there is not any cross placed before the name of Carwile. In Exhibit 12 the name of Carwile is written in the Socialist column, but there is not any

cross placed before the name. And in Exhibit L there is a cross in every square in the Republican and Socialist columns, and lines drawn through the names in the Prohibition and Independence columns, but there is not any cross in the square before Carwile's name. We think the court did not err in its rulings. Section 552, Revised Codes, provides that the elector "shall prepare his ballot by marking an 'X' in the square before the name of the person or persons for whom he intends to vote. * * * The elector may write in the blank spaces * * * the name of any person for whom he wishes to vote, and vote for such person by marking an 'X' before such name." Assuming that a substantial compliance with the provisions of this section is all that is required, these ballots were properly excluded. There was not a substantial compliance, or any compliance at all, with the statute. (*McKittrick* v. *Pardee,* 8 S. D. 39, 65 N. W. 23.)

2. *Defendant's Exhibit Z-1.* For the same reason defendant's Exhibit Z-1 was properly excluded. The cross was placed to the right of Jones' name and without the Republican column.

3. *Defendant's Exhibits H, T, U, Z-2.* Error is predicated upon the refusal of the trial court to count for Jones each of four ballots, marked substantially as follows:

| | Republican. | | Democratic. | | Socialist. |
|---|---|---|---|---|---|
| | Jones | | Carwile | | |
| X | | | | | |

We think the court's ruling correct. The Political Code of 1895, in section 1361, made provision for voting a straight party ticket, and also provided that an elector might vote a mixed ticket by placing "a cross *opposite the name* of every candidate," etc., for whom he intended to vote. This section was amended in 1901 (Laws 1901, p. 117) by abolishing the circle at the head of the party column, and by providing that the elector "shall prepare his ballot by marking an 'X' *before the name* of the person or persons for whom he intends to vote." The section as thus amended was further amended in 1907

(Laws 1907, p. 210) by providing that the elector "shall prepare his ballot by marking an 'X' *in the square before the name* of the person or persons for whom he intends to vote." We must assume that the legislature had some purpose in view in thus restricting the elector as to the manner in which he should express his intention. Similar statutes prevail in many of the states, and the courts are quite uniform in holding that, to constitute a substantial compliance with the law, at least the point of intersection of the two lines forming the cross must be *within the square before the candidate's name.* (*Parker* v. *Orr,* 158 Ill. 609, 41 N. E. 1002, 30 L. R. A. 227; *In re Hearst,* 48 Misc. Rep. 453, 96 N. Y. Supp. 119; *Rexroth* v. *Schein,* 206 Ill. 80, 69 N. E. 240; *McKittrick* v. *Pardee, supra;* 9 Current Law, 1050; *Smith* v. *Reid,* 223 Ill. 493, 79 N. E. 148.) The ballots now under consideration disclose that the cross is not in the square before the name of Jones, but is in the square before the blank space, left there in order that the elector might write in the name of some person for whom he desired to vote. As there was not any name written in this blank space, the elector failed to vote for anyone for the office of clerk of the district court. (*In re Ballot Marks,* 18 R. I. 822, 27 Atl. 608.)

4. *Defendant's Exhibit V.* The court also refused to count for Jones a ballot marked by crossing out all the names in the Democratic and Socialist columns, and on which there was not any cross in the square before the name of Jones. For the reasons given above this ruling of the trial court was correct. While the intention of the voter is generally a very material consideration, still, in order to have his ballot counted, he must express his intention substantially as indicated by the statute. (*McKittrick* v. *Pardee, supra.*) In *Dickerman* v. *Gelsthorpe,* 19 Mont. 249, 47 Pac. 999, this court said: "The distinctive feature of the Australian ballot system is the use of the mark in connection with the names of the candidates and questions to be voted on; and, of course, unless the mark is employed to indicate the choice of the voter in his ballot, the ballot he casts is a nullity, however clearly that choice may otherwise be expressed."

5. *Plaintiff's Exhibit 8.* Defendant assigns error in the ruling of the trial court in counting for plaintiff a ballot upon the outside of which is the following indorsement: "Voted by C. H. Heron and J. F. McKeon for illegibility of voter." The objection made to the ballot is that the reason given for assisting the voter is not one recognized by law. But the statute does not require the judges of election to certify the reason for assisting a voter, and the words "for illegibility of voter" may be disregarded as surplusage, and the objection upon the ground urged was properly overruled. If the defendant desired to show for what reason the voter was assisted, he should have called one or both of the judges of election to testify. There is not any objection that the certificate indorsed is not in compliance with the provisions of section 555 of the Revised Codes, nor that it is not shown that Heron and McKeon were judges of election in the precinct where the ballot was cast. The objection proceeds upon the assumption that these men were judges of election; and, since it is not made to appear for what reason they assisted the voter, if they did so, we must assume that they regularly performed their official duty. It is suggested in the brief of respondent that by the word "illegibility" was meant "illiteracy," and, if this fact had appeared, we think the ballot should not have been counted; for it appears that the amendment to section 1364, Political Code, attempted to be made in 1901 (Laws 1901, p. 117), was not properly adopted, and that inability on the part of the elector to read or write is not any reason for his receiving the assistance of the election judges. But this question was not squarely before the district court, and need not receive further consideration.

6. *Defendant's Exhibits I, F, Y.* The court counted for Jones three ballots, in each of which the cross mark is placed after Jones' name, but within the Republican column. In each of these instances we think the court erred. It cannot be said that the voter substantially complied with the law which requires him to place the cross *"in the square before the name."* This is the holding of the courts generally in construing stat-

utes similar to our own. (*McKittrick* v. *Pardee, above; Black* v. *Pate*, 130 Ala. 514, 30 South. 434.)

7. *Defendant's Exhibit J.* The court counted for Jones a ballot marked substantially as follows:

There is in fact a crossing of two lines within the square before the name of Jones. An examination of the entire ballot discloses that in most instances the elector made fairly good cross marks, but in nearly every instance there is manifest the difficulty under which the voter labored. His pencil marks are retraced, additional lines are made, the figures are crude, and the entire ballot shows that he was embarrassed by age, infirmity, insufficient light in the booth, or unfamiliarity with the use of a pencil. We do not think the legislature ever meant to require that a perfect letter "X," inclosed in quotation marks, should be the only means by which an elector can express his choice. Any mark which can be said to be a cross mark will answer. In the absence of anything to indicate a purpose on the part of the elector to identify his ballot by the use of a third line within the square, this defect ought not to vitiate the ballot. In *Parker* v. *Orr, above,* similar defects are illustrated in the opinion of the court, and they are there held not to render the ballot invalid. (See, also, 7 Current Law, 1245.) There was not any error in the trial court's ruling.

8. *Defendant's Exhibit L.* The court counted for Jones the ballot, defendant's Exhibit L above, and this action is claimed to be erroneous. As said above, a cross is placed before the name of every candidate in the Republican and Socialist columns, and the names in the Prohibition and Independence columns are crossed out by various marks. In our judgment, this ballot falls within the class mentioned in section 575, Revised Codes. That section provides that "any ballot * * * from which it is impossible to determine the elector's choice is void and must not be counted." The mere fact that the Socialists did not have any candidate for clerk of the district court does not militate against this position. We think the court

erred in counting this ballot for Jones. (*McMahon* v. *Polk,* 10
S. D. 296, 73 N. W. 79, 47 L. R. A. 830; *Hope* v. *Flentge,* 140
Mo. 390, 41 S. W. 1002, 47 L. R. A. 806.)

9. *Defendant's Exhibit M.* The court refused to count for
Jones a ballot, perfect in form, and upon which the voter indi-
cated his preference for Jones for clerk of the court, but from
the ballot the stub is not detached, and since the stub bears the
number corresponding to the number of a particular voter in
precinct 14, of course the identity of the voter could be ascer-
tained. But we think the court erred in disfranchising this
voter for the failure, on the part of the election officer, to do
his duty. It is a rule of well-nigh universal application ''that
one entitled to vote shall not be deprived of his privilege by
action of the authorities.'' (Cooley's Constitutional Limita-
tions, 775; *Lane* v. *Bailey,* 29 Mont. 548, 75 Pac. 191; McCrary
on Elections, p. 144.) In *Farnham* v. *Boland,* 134 Cal. 151, 66
Pac. 200, the court said: ''It is claimed that the trial court
should have rejected ballots which had the stub attached to
them—a stub that should have remained in the book from which
the ballots were taken. We hold that these ballots were prop-
erly counted, and likewise those were properly counted which
the officers of election placed in the ballot-box without first tear-
ing therefrom the numbers attached. It is quite apparent that
these violations of the law arose from the carelessness of the
election officers. Such carelessness or malconduct upon the
part of those officers may render them liable to severe penalties,
but that is all. The law as to identifying marks refers to marks
made by the voter, and it is only marks made by him that
demand the rejection of the ballot. After citing many cases
to the point this court said, in *People* v. *Prewett,* 124 Cal. 7, 56
Pac. 621: 'The principle underlying these decisions is that the
rights of the voters should not be prejudiced by the errors or
wrongful acts of the officers of election, unless it shall appear
that a fair election and an honest count were thereby pre-
vented.' '' (See, also, *Bates* v. *Crumbaugh,* 114 Ky. 447, 71 S.
W. 75; *Lynip* v. *Buckner,* 22 Nev. 426, 41 Pac. 762, 30 L. R. A.
354; *Moyer* v. *Van De Vanter,* 12 Wash. 377, 50 Am. St. Rep.

900, 41 Pac. 60, 29 L. R. A. 670.)    Section 552, Revised Codes, makes it the duty of the ballot judge to remove the stub, and, in the absence of any showing of a corrupt or unlawful purpose, it will be presumed that this omission was the result of accident or inadvertence; but in any event, neither Jones nor the voter should be made to suffer for the misconduct or mistake of an election officer, where, as in this case, there is not any showing that either participated in, or was at all responsible for, the error.

10. *Defendant's Exhibits K-1 and K-2.*   In precinct No. 13 there was found in the ballot-box a ballot badly torn, so that there are two separate portions of the ballot, and there is missing, from near the middle, a portion containing the names of two candidates in each party column.   The portion bearing the names of Jones and Carwile does not bear the official stamp; and, although the ballot was marked as for Jones, the trial court refused to count it for him.   In this we think the court erred.   Of course, if the ballot was mutilated by the voter, it ought not to be counted; for provision is made in the statute for supplying a voter. with a new ballot in the event he has mutilated the one first delivered to him.   But there is not anything here to indicate that this ballot was torn by the voter. In the absence of such showing the presumption is always in favor of the voter, and it would be presumed that the ballot was torn after it left the voter's hands.   This is the general rule.   But in this instance we are not left to rely upon presumptions.   When the two portions of the ballot are folded together, as they were by the voter, the evidence is so convincing as to be said to amount to a demonstration that the ballot was torn by the ballot judge in detaching the stub, and for this the elector cannot be made to suffer.

11. *Residence.*   From the total vote returned in favor of Jones the trial court deducted 4, on account of ballots cast for Jones in Broadview precinct by former residents of Iowa: Waterman, Leonard, Claude Barkhuff, and William Barkhuff. George A. Waterman came from Iowa to Yellowstone county in July, 1907, and engaged in the real estate business, and in

the business of locating homeseekers in Yellowstone county. At
that time he selected a homestead, but, when he went to the
land office to make his filing, ascertained that he already owned
too much land to be allowed to make the filing. He testified
that he determined to make his home in Yellowstone county in
July, 1907, and, when away, intended to return there, and that
since July, 1907, he had considered Yellowstone county his
home. His business in locating homeseekers kept him traveling
between Montana and Iowa much of the time, and while in
Montana he had no fixed place of abode other than the hotel
where he stopped. He filed on a homestead in April, 1908, and
about the same time brought his family from Iowa, and settled
in Broadview precinct. George Leonard came from Iowa to
Montana in August, 1907, and at that time selected and filed
upon a homestead. He says he came to look at the country,
and when he selected his homestead he formed his intention to
make it his home, and retained such intention thereafter. He
returned to Iowa to arrange his affairs to return to this state,
but without any intention of remaining in Iowa, and with a
fixed purpose to return to Montana and make it his permanent
and fixed place of residence. In the spring of 1908 he removed
his family from Iowa onto his homestead in Broadview precinct,
and resided there afterward. Claude and William Barkhuff
came from Iowa to Montana in October, 1907, and each selected
and filed upon a homestead. Each soon after returned to Iowa
to arrange his affairs to return to Montana to make it his home,
and without any intention of remaining in Iowa. From the
date of making his homestead filing each had intended his
homestead to be, and each had considered it as, his home—the
place to which he intended to return when away. Each brought
his family to Montana in the spring of 1908, and each then
settled upon his respective homestead in Broadview precinct,
and has resided there since. None of these men made any im-
provements upon his homestead until after the first of the year
1908, and none of them voted in Iowa while there, between the
fall of 1907 and the spring of 1908.

In attempting to define the term "residence," as used in election laws generally, the courts and text-writers have encountered great difficulty, and it may be said that there is not any definition which has been formulated that will apply to the facts of every case. From the decided cases certain rules may be gathered which are intended to aid in applying the law to the facts of a particular case. In this state those rules are crystallized into a statute—section 481, Revised Codes. But even those rules are so very general in their terms that they afford very little assistance. In other words, it is as easy to understand the meaning of "residence" as it is to understand the meaning of some of the terms used in the rules for determining the meaning of "residence." Every case must stand upon its own facts, and a decision in any event must, of necessity, be the result of a more or less arbitrary application of the rules of law to the facts presented.

In view of the facts appearing that the family of each of these men remained in Iowa until after November, 1907, we must start our inquiry by the application of rule 8 of section 481 above: "The place where a man's family resides is presumed to be his place of residence." This is in reality a rule of evidence; and, when the plaintiff showed that the family of each of these four men remained in Iowa until after November, 1907, he made out a *prima facie* case against the right of each to vote, and the burden was cast upon the defendant to show a state of facts which brought the men within the definition of a legal voter of Montana. We may derive assistance, in attempting to solve this problem, by reversing the case somewhat, and assume that these men, having done the things which they did in Montana in the summer of 1907, had, upon their return to Iowa, sought to vote there. Would they have been held to be legal voters there? We think not. And we think our answer is the correct interpretation of the court's decision in *Vanderpoel* v. *O'Hanlon,* 53 Iowa, 246, 36 Am. Rep. 216, 5 N. W. 119. At the time that case was decided Iowa does not seem to have had a statute similar to our rule 2 of section 481 above, and the fact that the plaintiff was a student attending college was not

a factor in the decision. The case was decided upon principles
of law applicable to voters generally. The plaintiff's family
resided in Mitchell county. Plaintiff went to Johnson county to
attend the Iowa State University, and was there for three
years. In 1878 he returned to Mitchell county, and offered to
vote. His vote was challenged, and the case resulted. The
court announced these two general rules: (1) A residence once
gained continues until another is acquired; and (2) when a
new residence is acquired, the old one is lost. The court also
said: "If it was the intention of the plaintiff to return to
Mitchell county when he had finished his education, it would
probably be conceded that his place of residence, within the
meaning of the Constitution, continued to be in Mitchell county
during all the time he was absent. And, on the other hand, it
would probably be admitted, if, when he went to Iowa City, or
at any time thereafter before he offered to vote, his intention
was to make that place his home and residence when he ceased
to attend the University, that such place was and became his
place of residence in such sense that he would have become a
legal voter in Johnson county." Applying the decision in that
case to the facts relating to these four men, and the conclusion
would seem inevitable that, if they intended to return to Iowa
from Montana to make Iowa their home, their residence in
Iowa would be held to continue during the entire period of their
absence therefrom. If, on the other hand, when they came to
Montana, *or while here,* they intended to make Montana their
home and residence, then Montana became and was their place
of residence, in the sense of that term as used in the election
laws. If, then, these men lost their residence in Iowa by reason
of the facts related, it follows that they gained one in Montana;
for it is a rule, recognized practically everywhere, that a resi-
dence cannot be lost until another is gained. (Rule 9, sec. 481,
above.)

A case somewhat similar to this is presented in *State ex rel.
Smith* v. *Deniston,* 46 Kan. 359, 26 Pac. 742. Stringer, who
had been a resident elector in Kansas, went to Oklahoma, and
on June 8, 1889, filed on a homestead claim, broke some ground,

and put in a small crop. He testified that from the time he made his homestead filing, he intended to make Oklahoma his home and raise his family there. He went back to his former place of residence in Kansas to see his family, who still remained there, and, while there, voted on November 5, 1889. Two days later he left for Oklahoma. His family followed him shortly afterward, and all resided in Oklahoma since that time. Upon this state of facts the Kansas court held that he had lost his legal residence in Kansas, and was not qualified to vote there. The only difference between Stringer's case and the case of Leonard and the two Barkhuffs is that Stringer plowed some ground and planted a small crop on his homestead. But neither of these is a determining factor. Each tends to give emphasis to Stringer's purpose to make Oklahoma his home; but the determining factors were his selection of a new home, coupled with his intention to make that place his home.

Rule 9 of section 481 further provides: "A change of residence can only be made by the act or removal joined with the intent to remain in another place." While the word "or" appears in the Code, the word "of" is evidently intended. The inquiry immediately arises: When did these men remove from Iowa to Montana? Our judgment, based upon reason and the adjudications, is that their coming to Montana in the summer of 1907, coupled with the selection of new homes here, constituted the removal mentioned in the statute. The word "removal" means the act of making a change in place; and, as applied to these men, it means the act of changing their former homes in Iowa to their new homes in Montana. Waterman did not file on a homestead in 1907, but he did engage in business in Yellowstone county, and formed the intention of making that county his home.

After all, in prescribing the one year's residence as a qualification for the voter, our Constitution and statutes look to two primary objects, (1) familiarizing the elector with the conditions and needs of his new home, and with the qualifications of candidates; and (2) preventing the colonization of illegal voters.

In the view we have taken there does not appear from this record to have been any error in the conclusion of the trial court that Carwile received 1,577 legal votes; but, from the 1,575 votes counted for Jones, there should be deducted 4, represented by defendant's Exhibits I, F, Y, and L, leaving 1,571, and to this should be added 6, represented by the torn ballot, the ballot from which the stub was not detached, and the votes of Waterman, Leonard, and the two Barkhuffs, thus giving to Jones also a total of 1,577 legal votes, and resulting in a tie vote, or a failure on the part of the electors of Yellowstone county to choose a clerk of the district court.

The judgment is reversed and the cause is remanded to the district court, with directions to vacate the judgment entered, and to enter a judgment according to the facts and conclusions herein announced.   Each party will pay his own costs.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE SMITH: I concur in all that is said in the foregoing opinion, with this exception: I believe that the district court was correct in counting the ballot marked "Exhibit L," for Mr. Jones.   The voter complied literally with the statute in marking this ballot; he marked an "X" in the square before the name of Mr. Jones.   This vote for Jones was not nullified or offset by the "X" placed before the blank space in the Socialist column, because that party had no candidate for the office of clerk of the district court.   My opinion is that, when the voter complies literally with the statute, as a matter of law his vote is thereby cast, and the court has no power to examine the remainder of the ballot for the purpose of finding out what his intention may have been, or to inquire into his intention at all.   (See *People* v. *Seaman,* 5 Denio (N. Y.), 409-412, *Beardstown* v. *Virginia,* 76 Ill. 34-48, and *People* v. *Saxton,* 22 N. Y. 309, 78 Am. Dec. 191.)   To me it seems a corollary of the principle upon which Exhibits H, T, U, and Z-2 are rejected that Exhibit L should be counted.   Those exhibits bear palpable

evidence that the persons casting them intended to vote for
Jones, but that intention may not be given effect because the
"X" is not in the square; consequently Exhibit L should be
counted for Jones without further examination, for the reason
that the "X" is in the square. I can see no escape from this
conclusion.

I think, therefore, that the judgment of the district court
should be reversed and the cause remanded, with instructions to
enter judgment declaring the appellant to be entitled to the
office in question.

Rehearing denied May 6, 1909.